## OSCEOLA OIL CO. et al. v. STEWART DRILLING CO. (No. 9984.)

(Court of Civil Appeals of Texas. Fort Worth. June 10, 1922. Rehearing Denied Oct. 21, 1922. Writ of Error Granted Dec. 13, 1922.)

1. **Mines and minerals** ⊂⇒109—**Evidence as to honesty of drilling company's superintendent held inadmissible except for purposes of impeachment.**

In a drilling company's action against an oil company for a balance due under a contract to drill to a depth of 2,000 feet unless oil or gas in paying quantities was found at a lesser depth, wherein defendant claimed that plaintiff had drilled through oil-bearing sand in order to be paid for drilling the full 2,000 feet, a statement imputed to plaintiff's driller that he did not know whether plaintiff's superintendent was "crooked or not" *held* inadmissible, except for the purpose of impeaching the credibility of the witness.

2. **Appeal and error** ⊂⇒739—**Assignment of error to entire instruction will be overruled if unobjectionable in part.**

An assignment of error to an instruction as a whole must be overruled where the instruction was unobjectionable in part.

3. **Mines and minerals** ⊂⇒109—**Drilling contract construed as to owner's right to test well.**

In a drilling company's action against an oil company for a balance due under a contract to drill a well to a depth of 2,000 feet unless oil or gas in paying quantities was found at a lesser depth, plaintiff being obligated, "in case an oil-bearing sand is encountered, to set casing and bail the hole dry, and drill in said well, and make a sufficient test of sand; second party's judgment shall determine if a paying well has been drilled in," *held*, that the contract did not give defendants the right to require a test

of the sand by casing the well and bailing the hole dry, at a point before the maximum depth was reached, but merely to determine whether or not a well drilled in after the test was made was a paying well.

4. **Mines and minerals** ⊂⇒109—**Instruction on burden of proof as to reaching oil-bearing sand held properly refused.**

In an action by a drilling company against an oil company to recover a balance due under a contract to drill a well to a depth of 2,000 feet unless oil or gas in paying quantities was found at a lesser depth, wherein defendant contended that plaintiff had drilled through oil-bearing sand without sufficiently testing it, it was not error to refuse to charge that the burden of proof was on plaintiff to prove that an oil-bearing sand was not encountered at less than the maximum depth.

5. **Trial** ⊂⇒350(4)—**Issue as to good-faith belief that oil-bearing sand was reached held properly refused in driller's action.**

In a drilling company's action against an oil company for a balance due under a contract for the drilling of a well to a depth of 2,000 feet unless oil or gas was found in paying quantities at a lesser depth, wherein defendant contended that plaintiff had drilled through oil-bearing sand without sufficiently testing it, it was not error to refuse to submit an issue as to good-faith belief that sand found at a lesser depth was oil bearing; the contract not giving the defendants the right at their option to have every sand tested by casing the well and pumping the hole dry.

6. **Mines and minerals** ⊂⇒109—**Irrelevant and immaterial evidence properly excluded.**

In an action for a balance due under a contract to drill a well for an oil company, wherein defendants contended plaintiff had drilled through oil-bearing sand without sufficiently testing it, it was not error to exclude evidence offered by defendants that the son of one of them intended to drill an oil well on a lease owned by him situated near defendants' lease; such evidence being wholly immaterial and irrelevant.

7. **Evidence** ⊂⇒258(1), 317(10)—**Evidence as to reaching oil-bearing sand held inadmissible as hearsay or admission.**

In an action on a balance due under a contract to drill a well for an oil company to a maximum depth of 2,000 feet unless paying oil or gas was found at a lesser depth, defendants claiming that plaintiff drilled through oil-bearing sand without sufficiently testing it, it was not error to exclude evidence by one of defendants that plaintiff's helper had stated that in his opinion the sand reached was oil bearing, such evidence being hearsay, and no proof being offered to show that the helper's duties were such as to make his statements binding on plaintiff.

8. **Judgment** ⊂⇒253(1)—**Recovery in greater sum than that claimed will not be upheld.**

In an action for a balance due under a contract to drill a well for an oil company, a judgment for a greater sum than that claimed in the petition is erroneous.

———

⊂⇒For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

**9. Mines and minerals ⬤109—Allowance for reaming and testing oil well held not to include time when drilling shut down.**

In an action for a balance due under a contract to drill a well for an oil company, providing for a charge of $150 per day for testing and reaming the well, recovery could not be allowed at such rate for the time the drilling was shut down in addition to the time consumed in reaming and testing.

**10. Interest ⬤38(1)—Judgment draws interest from date at 6 per cent.**

By the direct provisions of Vernon's Sayles' Ann. Civ. St. 1914, art. 4981, a judgment draws interest from its date at the rate of 6 per cent. per annum.

Appeal from District Court, Wichita County; P. A. Martin, Judge.

Action by the Stewart Drilling Company against the Osceola Oil Company and others. Judgment for plaintiff, and defendants appeal. Reversed and remanded, unless remittitur filed.

Fitzgerald & Hatchitt and Weeks, Morrow & Francis, all of Wichita Falls, for appellants.

Carrigan, Montgomery, Britain, Morgan & King, of Wichita Falls, for appellee.

DUNKLIN, J. T. E. Allday and others, composing the partnership firm of the Stewart Drilling Company, recovered a judgment against the Osceola Oil Company, alleged to be "an association in the nature of a partnership," and Russell A. Richardson and C. C. Drake, as individual members of the said association with partnership liability for its obligations. This appeal is by the defendants from that judgment.

The suit was based upon a written contract by the terms of which the plaintiff firm agreed to drill a well for oil and gas upon a lease held by the defendants. In the written contract the plaintiff firm is designated as party of the first part, and the defendant Osceola Oil Company is referred to as party of the second part. The following provisions are contained in the written contract:

"Whereas, the said second party desires to engage and employ the services of the first party to drill a well on said above-described lease, at a location to be determined by party of the second part, for oil and gas, to a depth of two thousand (2,000) feet unless oil or gas is found in paying quantities at a lesser depth, and does by these presents engage and employ said party of the first part to drill said well; and

"Whereas, the said party of the first part desires to secure said employment and agrees to drill said well for said second party to the desired depth unless oil or gas is found in paying quantities at a lesser depth:

"Now, therefore, in consideration of the mutual covenants, stipulations, and conditions hereinafter contained, said party of the first part agrees and binds itself to drill said well on said lease, and said second party agrees and binds itself to pay said first party the amounts stipulated and under the terms hereinafter provided.

"Party of the first part, for a total consideration of thirty five thousand ($35,000.00) dollars, payable as hereinafter stipulated agrees to furnish the derrick, machinery, labor, fuel, water, and everything requisite to the drilling of said well, or what is known as a turnkey job, without any additional expense to party of the second part, and, in case an oil-bearing sand is encountered, to set casing and bail the hole dry, and drill in said well, and make a sufficient test of sand; second party's judgment shall determine if a paying well has been drilled in.

"Party of the second part agrees to pay to party of the first part the sum of $150.00 per day for every day used in making any test in said well and in reaming down for same. * * *

"It is understood and agreed that the consideration above mentioned shall be due and payable as follows: $2,500.00 stock in Osceola Oil Company, said stock to be delivered to first party when the well is completed; $5,000.00 when the rig is moved on the lease; $5,000.00 when the said well reaches a depth of 1,000 feet; $5,000.00 when the said well reaches a depth of 1,500 feet; and the balance when the well is completed and turned over to the second party.

"It is especially understood and agreed that the first party shall drill said well in a first-class workmanlike manner and to use due diligence in safeguarding the party of the second part against any accident which might work an injury to any oil-bearing sand encountered in said well."

The plaintiffs drilled the well to the depth of 2,000 feet, and this suit was instituted to recover the balance alleged to be due on the contract price, to wit, $18,775. The recovery was for $18,875, with interest from the date of the completion of the well. No oil or gas was discovered, but at a depth of 1,809 feet a sand was found which gave some indication that possibly oil in paying quantities might be developed therefrom. The plaintiffs' employés in charge of the drilling operations made tests of this sand when it was first encountered, but according to their contention the test failed to show that the sand contained oil in paying quantities. They then drilled through that sand to the required depth of 2,000 feet, as stipulated in the contract. Representatives of the defendants were on the ground about the time the sand was reached, and insisted that the sand be tested for oil by setting the casing from the top of the well to the sand and by bailing the hole dry, as stipulated in the contract, before the well was drilled deeper. The well was drilled with a rotary machine. Plaintiffs' representatives in charge of the drilling refused to make the test demanded, but made other tests, whch, according to their testimony,

were sufficient to demonstrate conclusively that the sand was barren of oil. The test so made consisted of drilling into the sand with a smaller bit and taking out the sand in cores. The samples of sand so brought out were examined and tested by the usual method employed under such circumstances, but the same showed no oil contents.

One of the defenses urged by the defendants was that it was the duty of the plaintiffs, under and by virtue of the contract, to make the test of the sand which the defendants demanded, and that, in the absence of a compliance with that demand plaintiffs were in no position to demand a recovery, since they failed to show a compliance with their part of the contract without any excuse for such failure. Another defense was that the plaintiffs drilled through the sand without making the proper test of it for the fraudulent purpose of avoiding the expense and trouble of making such test and realizing the contract price for the depth of 2,000 feet.

The case was tried before a jury, to whom was submitted special issues. Those issues, with the findings of the jury thereon, are as follows:

"No. 1. Find from the evidence before you whether or not the plaintiffs in drilling the well for the defendants struck an oil-bearing said at a depth of approximately 1,809 feet? Answer: No.

"No. 2. Find from the evidence before you whether the plaintiffs were guilty of any fraud in their action or conduct toward the defendants in any of the following particulars:

"(a) Did they reach and pass an oil-bearing sand at approximately 1,100 feet? Answer: No.

"(b) Did they fraudulently or intentionally drill through any oil-bearing sand in order to complete their contract without having to pay testing expenses? Answer: No."

The lease upon which the well was located was in unproven territory, but was near what was known as the K. M. A. oil field, being a producing oil field at about the depth of 1,800 feet.

The defendants Russell A. Richardson and C. C. Drake were the managing officers of the defendant company, and they employed C. L. Richardson to stay at the well and keep posted as to its log. None of those parties were experienced oil men. J. C. Parks, an employé of the plaintiffs, supervised the drilling of the well, and Fred Bridges was the driller in charge during the day, there being another driller who worked at night. Parks referred C. L. Richardson to Bridges for information as to the log of the well and its condition generally, and instructed Bridges to keep him fully posted as to the exact condition of the well, and of the different formations that were being encountered during the drilling operations. The evidence showed without controversy that C. L. Richardson, the defendants' representative, was at the well practically all the time it was being drilled; that he was furnished with the log of the well and kept fully informed as to the formations which were being encountered. The proof further showed that, when the oil sand in controversy was struck, both C. L. Richardson and defendant Russell A. Richardson, who was the president of the defendant company, were present, and that they were shown samples of the sand and informed of the test made of it by plaintiffs' representatives and the results of those tests, which indicated that it contained no oil. C. L. Richardson further testified that, when the sand was first struck and had been drilled into for a short distance, Bridges, the driller, told him, "We have got a well," and again made substantially the same statement after he had taken out samples of the sand. Russell A. Richardson also testified that soon after the sand was first reached he went out to the well and was there told by Bridges that they were in the sand and that it looked very good, and that they had a slight showing of oil. Bridges testified that he never told either of the Richardsons or any one else that he had struck an oil-bearing sand in the well.

Bridges was the day driller, and during the night stayed at his home some distance from the lease. In answer to questions propounded by counsel for the defendants, Russell A. Richardson testified that, after Bridges had told him at the well that the sand struck looked very good and had a slight showing of oil, he went to Wichita Falls in search of Mr. Parks, the superintendent in charge, for the purpose of requesting him to stop the drilling and set the casing for the purpose of testing the sand for oil, but that after failing to find Mr. Parks he started back to the well about 10 o'clock at night in company with a friend from St. Louis, a Mr. Potthoff whom he requested to accompany him. He further testified as follows:

"We went out in a Ford. When I got to Dundee, Fred Bridges, head driller, lived at Dundee; he and his wife and a little child that lived there. I drove to the porch, got out, and knocked at the door. Fred come to the door and spoke to me, and I hadn't been able to find Parks, and I said, 'Fred, what do you think about this?' and he said, 'Mr. Richardson, I cannot talk; you know my position here; I cannot say whether Parks is crooked or not.' I am repeating the very words he said, 'We have reached the sand, and have got a good showing.' Those are the words he told me."

Potthoff was also introduced as a witness by the defendant and testified to the visit to the home of Bridges in company with Russel A. Richardson, and further testified as follows:

"He stopped at somebody's place and called them to the door. It was dark, about 11 o'clock in the evening, and it was a small building, small one-story building. We stopped in front

of the porch. I heard the conversation between Mr. Richardson and the party that came to the door. We drove in front of the building there, and Mr. Richardson got out of the car and knocked on the door several times, and a man came to the door, and Mr. Richardson said, 'Fred,' and he said, 'Hello, Mr. Richardson.' Mr. Richardson said, 'What do you think about it?' He said, 'Well, I cannot talk to you; you know the position I am in here;' he said, 'I don't know whether Parks is crooked or not; we are in the sand now that I have been looking for and got a good showing of oil;' and I think that fellow said casing the well and testing the well, and Mr. Richardson asked him if that was the K. M. A. sand, and he said he thought it was."

Upon request of counsel for plaintiffs, the jury was instructed by the trial judge that the testimony quoted above by Richardson and Potthoff as to statements alleged to have been made by Bridges at his residence on the occasion of the visit of the witnesses referred to by them could be considered for no other purpose except as tending to impeach the credibility of Bridges as a witness upon the trial.

Error has been assigned to that instruction. It is insisted that, since Bridges was appointed as the representative of the plaintiffs to give information with respect to the formations in the well and the log, any statements made by him upon the subject would be admissible as original evidence against the plaintiffs of the truth of such statements, under such authorities as 2 Mechem on Agency, § 1778, and 1 R. C. L. p. 483, § 19.

[1, 2] It will be observed that the instruction so given by the court was confined solely to the alleged statements made by Bridges at his residence, some distance from the well, late at night, and while he was not on duty at the well and while the night driller was in charge of the work. The statement imputed to Bridges implying doubt of the honesty of Parks, who was plaintiffs' superintendent in control of the well, clearly was not admissible, and, even though plaintiffs did not object to it, there was no error in limiting it. The objection to the instruction was to it as a whole, and since the same was unobjectionable in part, the assignment complaining of it must be overruled. And some of us are of the opinion further that any possible error in giving it was harmless, at all events, in view of the fact that it did not refer to or limit other testimony already mentioned to the effect that Bridges while on duty at the well and after he had struck the sand in controversy, said that he believed the sand was oil bearing, and in view of the further fact that according to the uncontroverted proof the log, samples of sand, and all other information which Bridges or the superintendent in charge had relative to the sand was furnished to the representative of the Osceola Oil Company, and further drilling of the well through the sand was delayed for several days, by reason of the demand made for the test stipulated in the contract. Accordingly the assignment now under discussion is overruled.

[3] We overrule the further contention made by appellants that under and by virtue of the terms of the contract, independent of whether or not the sand was in fact oil bearing, and independent of the further fact that plaintiffs did not fraudulently and intentionally drill through the sand in order to go to the depth of 2,000 feet without incurring the expense of making the test, the appellants had the right to require the test of the sand provided for in the written contract, to wit, the casing of the well down to the sand and bailing the hole dry in order to determine whether or not the sand was oil bearing. The contract was in writing, and it did not give appellants that right. The portion of the contract upon which that contention is based reads:

"And in case an oil-bearing sand is encountered, to set the casing and bail the hole dry and drill in said well and make a sufficient test of the sand; second party's judgment shall determine if a paying well has been drilled in."

According to that stipulation the option given to the appellants relative to the subject is confined to a determination of whether or not a well drilled in after the test is made is a paying well. If the defendants had desired the right to have the test last referred to made whenever any sand was reached, which in the opinion of their representative was a paying sand, regardless of whether or not such opinion was well founded, they should have embodied such a stipulation in the written contract.

[4] The trial court did not submit any charge upon the burden of proof, to which failure the appellants duly excepted, and in that connection they requested the court to give to the jury the following instruction:

"You are instructed that the burden of proof in this case rests upon the plaintiff to prove that an oil-bearing sand was not encountered in the well being drilled at a depth of about 1,809 feet."

The uncontroverted proof showed that the well was completed to a depth of 2,000 feet. After it was finished, whether or not an oil-bearing sand was found at a depth of 1,809 feet was apparently not susceptible of exact proof. The proof relied on to establish the affirmative of that issue depended entirely upon the opinions of different witnesses. We entertain grave doubt that the burden was on the plaintiffs to show, by a preponderance of the evidence, that the sand in controversy was not oil bearing, rather than on the defendants to show the contrary. Without determining that question, we are of the opinion that under the facts of this case the court did not err in failing in his charge to

the jury to place the burden on the plaintiffs to establish the negative of that issue. See Prince Line Co. v. Steger (Tex. Civ. App.) 210 S. W. 233; Chittim v. Martinez, 94 Tex. 145, 58 S. W. 948; T. & P. Ry. Co. v. Thorp (Tex. Civ. App.) 198 S. W. 335; Blum v. Strong, 71 Tex. 322, 6 S. W. 167.

[5] If we are correct in our foregoing conclusion that the written contract did not give to the defendants the right at their option to have every sand tested by casing the well and pumping the hole dry, then the court did not err in refusing the issue requested by them as to whether or not they in good faith believed that the sand in controversy was oil bearing.

[6] Nor was there any error in excluding the testimony offered by the defendants that Carl Richardson, the son of Russell A. Richardson, intended to drill an oil well on a lease owned by him situated near the defendants' lease. The testimony was wholly immaterial and irrelevant to any issue in the case.

[7] The court also excluded the proffered testimony of Russell A. Richardson to the effect that one Allen, who worked as a helper on the well, had stated to the witness, in substance, that in his opinion the sand in controversy was oil bearing. That testimony was clearly hearsay, and no proof was offered to show that Allen's duties under his employment by the plaintiffs was such as to make his declaration binding upon them on the theory of admissions against interest.

[8] Another complaint is made of the judgment on the ground that it was excessive. The judgment was for the sum of $18,875, with interest from the 4th day of May, 1920, amounting to $1,138.79, and aggregating in all the sum of $20,013.79. May 4, 1920, was the date of the completion of the well, and interest was allowed at the rate of 6 per cent. from that date up to the date of the trial. It thus appears that there was an excess in the judgment, over and above the amount claimed in the petition, of at least $100, the aggregate amount claimed in the petition being $18,775.

[9] The amount claimed in the petition included $1,275 as a charge for testing and reaming the well, which it was alleged consumed 8½ days, and for which they charge $150 per day, the price stipulated in the written contract. Appellants insist that the testimony of J. C. Parks, plaintiffs' superintendent in charge of the work, was insufficient to sustain a recovery of the full amount of that item, in that, according to his testimony, the time for which the claim was made included the time when the drilling was shut down as well as the time consumed in reaming and testing. We are of the opinion that that contention should be sustained. We have carefully read the evidence of Parks, quoted in appellants' brief, and also that portion of his testimony referred to in appellees' brief, to sustain the court's finding. The testimony of that witness, who is the only witness offered to prove the claim for reaming and testing, is too vague and indefinite to support a finding for any definite amount for reaming and testing, for which a claim of $150 per day was asserted. The witness was indefinite as to the number of days for which the claim was made. In one portion of his testimony he did state that it covered 9 days, but in another portion of his testimony he stated that it covered 8½ days, and in both instances he said that the charges made included the time during which the drilling was shut down as well as the time consumed in reaming and testing. He was unable to fix the number of days during which the drilling was shut down. He further stated, in substance, that the shut-down of drilling operations was due to the insistence by the defendants' representatives that a test should be made of the sand in accordance with the method prescribed in the written contract. Accordingly we are of the opinion that the court erred in allowing a recovery of $1,275 for reaming and testing. That error, and also the error in allowing a recovery for $100 in excess of the amount claimed in plaintiffs' petition, will require the judgment of the trial court to be reversed and the cause remanded, unless the appellants shall within 10 days from the date of this judgment file a remittitur of those two amounts, with interest thereon at the rate of 6 per cent. per annum from May 4, 1920, up to the date of the trial. But, if such remittitur is filed, then the judgment of the trial court will be so reformed as to deduct from the amount of the recovery the amount so remitted, thus leaving the balance after such deduction is made $17,500 as the amount of the principal of the judgment of the trial court, and as so reformed the judgment will draw interest at the rate of 6 per cent. per annum from its date, and will accordingly be affirmed with that change made in it if the remittitur is filed.

[10] In this connection, we will further say that there was no error in decreeing that the judgment for the proper amount should draw interest from its date at the rate of 6 per cent. per annum since it is so provided by article 4981, V. S. Tex. Civ. Statutes.

Reversed and remanded, unless remittitur is filed.