### OSCEOLA OIL CO. et al. v. STEWART DRILLING CO. et al.　(No. 436-3902.)

(Commission of Appeals of Texas, Section B. Feb. 27, 1924.)

1. **Evidence** ⟨Key⟩244(7)—**Statements of driller as to quality of sand drilled through held admissible.**

In an action for a balance due under a contract to drill an oil well to a depth of 2,000 feet, unless paying sand was found at a lesser depth, where defendants claimed plaintiff had drilled through oil-bearing sand at 1,800 feet in order to be paid for the full 2,000 feet and avoid the cost of a test, statements by one of plaintiff's drillers, who had been authorized to give defendants information concerning the work, affecting the quality of sand through which they had drilled, *held* admissible on that issue, and its use improperly restricted to impeachment purposes only.

2. **Principal and agent** ⟨Key⟩115(1)—**Principal bound by authorized information given by agent.**

A principal who has designated another to make particular statements or to give particular information is bound by the declarations of the agent in the line of his duty.

3. **Trial** ⟨Key⟩256(2)—**Counsel objecting to instructions not required to submit corrected form.**

Counsel objecting to an instruction and pointing out specifically error therein are not required to go further and themselves prepare a correct charge.

4. **Appeal and error** ⟨Key⟩1064(1)—**Lack of prejudice from erroneous charge must clearly appear.**

For an erroneous charge not to be grounds for reversal, it must clearly appear that no prejudice resulted.

5. **Mines and minerals** ⟨Key⟩109—**Denial of instruction on burden of proof as to reaching oil-bearing sand held not error.**

In an action to recover a balance due on a contract to drill an oil well to a particular depth, unless paying sand was found at a lesser depth, denial of an instruction that the burden was on plaintiff to show that it had not passed through an oil-bearing sand in order to secure payment for drilling the entire depth *held* not error.

Error to Court of Civil Appeals of Second Supreme Judicial District.

Action by the Stewart Drilling Company and others against the Osceola Oil Company and others. Judgment for plaintiff was affirmed by the Court of Civil Appeals (246 S. W. 698), on condition that a remittitur be filed, and defendants bring error. Judgments of district court and Court of Civil Appeals both reversed, and cause remanded.

Weeks, Morrow & Francis and Fitzgerald & Hatchitt, all of Wichita Falls, for plaintiffs in error.

Carrigan, Montgomery, Britain & Morgan, of Wichita Falls, for defendants in error.

POWELL, P. J. The Court of Civil Appeals favors us with an admirable statement of the nature and result of this case as follows:

"T. E. Allday and others, composing the partnership firm of the Stewart Drilling Company, recovered a judgment against the Osceola Oil Company, alleged to be 'an association in the nature of a partnership,' and Russell A. Richardson and C. C. Drake as individual members of the said association with partnership liability for its obligations. This appeal is by the defendants from that judgment.

"The suit was based upon a written contract by the terms of which the plaintiff firm agreed to drill a well for oil and gas upon a lease held by the defendants. In the written contract the plaintiff firm is designated as party of the first part, and the defendant Osceola Oil Company is referred to as party of the second part. The following provisions are contained in the written contract:

"'Whereas, the said second party desires to engage and employ the services of the first party to drill a well on said above-described lease, at a location to be determined by party of the second part, for oil and gas, to a depth of two thousand (2,000) feet unless oil or gas is found in paying quantities at a lesser depth, and does by these presents engage and employ said party of the first part to drill said well; and

"'Whereas, the said party of the first part desires to secure said employment and agrees to drill said well for said second party to the desired depth unless oil or gas is found in paying quantities at a lesser depth:

"'Now, therefore, in consideration of the mutual covenants, stipulations, and conditions hereinafter contained, said party of the first part agrees and binds itself to drill said well on said lease and said second party agrees and binds itself to pay said first party the amounts stipulated and under the terms hereinafter provided.

"'Party of the first part, for a total consideration of thirty-five thousand ($35,000.00) dollars payable as hereinafter stipulated, agrees to furnish the derrick, machinery, labor, fuel, water, and everything requisite to the drilling of said well, or what is known as a turnkey job, without any additional expense to party of the second part; and in case an oil-bearing sand is encountered, to set casing and bail the hole dry, and drill in said well and make a sufficient test of sand, second party's judgment shall determine if a paying well has been drilled in.

---

⟨Key⟩For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

" 'Party of the second part agrees to pay to party of the first part the sum of $150.00 per day for every day used in making any test in said well and in reaming down for same. * * *

" 'It is understood and agreed that the consideration above mentioned shall be due and payable as follows: $2,500.00 stock in Osceola Oil Company, said stock to be delivered to first party when the well is completed; $5,000.00 when the rig is moved on the lease; $5,000.00 when the said well reaches a depth of 1,000 feet; $5,000.00 when the said well reaches a depth of 1,500 feet; and the balance when the well is completed and turned over to the second party.

" 'It is especially understood and agreed that the first party shall drill said well in a first-class workmanlike manner and to use due diligence in safeguarding the party of the second part against any accident which might work an injury to any oil-bearing sand encountered in said well.'

"The plaintiffs drilled the well to the depth of 2,000 feet and this suit was instituted to recover the balance alleged to be due on the contract price, to wit, $18,775. The recovery was for $18,875, with interest from the date of the completion of the well. No oil or gas was discovered, but at a depth of 1,809 feet a sand was found which gave some indication that possibly oil in paying quantities might be developed therefrom. The plaintiffs' employés in charge of the drilling operations made tests of this sand when it was first encountered, but according to their contention the test failed to show that the sand contained oil in paying quantities. They then drilled through that sand to the required depth of 2,000 feet, as stipulated in the contract. Representatives of the defendants were on the ground about the time the sand was reached, and insisted that the sand be tested for oil by setting the casing from the top of the well to the sand and by bailing the hole dry, as stipulated in the contract, before the well was drilled deeper. The well was drilled with a rotary machine. Plaintiffs' representatives in charge of the drilling refused to make the test demanded, but made other tests which, according to their testimony, were sufficient to demonstrate conclusively that the sand was barren of oil. The test so made consisted of drilling into the sand with a smaller bit and taking out the sand in cores. The samples of sand so brought out were examined and tested by the usual method employed under such circumstances, but the same showed no oil contents.

"One of the defenses urged by the defendants was that it was the duty of the plaintiffs, under and by virtue of the contract, to make the test of the sand which the defendants demanded, and that in the absence of a compliance with that demand plaintiffs were in no position to demand a recovery, since they failed to show a compliance with their part of the contract without any excuse for such failure. Another defense was that the plaintiffs drilled through the sand without making the proper test of it for the fraudulent purpose of avoiding the expense and trouble of making such test and realizing the contract price for the depth of 2,000 feet.

"The case was tried before a jury, to whom was submitted special issues. Those issues, with the findings of the jury thereon, are as follows:

" 'No. 1. Find from the evidence before you whether or not the plaintiffs in drilling the well for the defendants struck an oil-bearing sand at a depth of approximately 1,809 feet? Answer: No.

" 'No. 2. Find from the evidence before you whether the plaintiffs were guilty of any fraud in their action or conduct toward the defendants in any of the following particulars:

" '(a) Did they reach and pass an oil-bearing sand at approximately 1,100 feet? Answer: No.

" '(b) Did they fraudulently or intentionally drill through any oil-bearing sand in order to complete their contract without having to pay testing expenses? Answer: No.'

"The lease upon which the well was located was in unproven territory, but was near what was known as the K. M. A. oil field, being a producing oil field at about the depth of 1.800 feet.

"The defendants Russell A. Richardson and C. C. Drake were the managing officers of the defendant company, and they employed C. L. Richardson to stay at the well and keep posted as to its log. None of those parties were experienced oil men. J. C. Parks, an employé of the plaintiffs, supervised the drilling of the well, and Fred Bridges was the driller in charge during the day; there being another driller who worked at night. Parks referred C. L. Richardson to Bridges for information as to the log of the well and its condition generally, and instructed Bridges to keep him fully posted as to the exact condition of the well, and of the different formations that were being encountered during the drilling operations. The evidence showed without controversy that C. L. Richardson, the defendants' representative, was at the well practically all the time it was being drilled; that he was furnished with the log of the well, and kept fully informed as to the formations which were being encountered. The proof further showed that when the oil sand in controversy was struck both C. L. Richardson and defendant Russell A. Richardson, who was the president of the defendant company, were present, and that they were shown samples of the sand and informed of the test made of it by plaintiffs' representatives and the results of those tests, which indicated that it contained no oil. C. L. Richardson further testified that when the sand was first struck and had been drilled into for a short distance that Bridges, the driller, told him, 'We have got a well,' and again made substantially the same statement after he had taken out samples of the sand. Russell A. Richardson also testified that soon after the sand was first reached he went out to the well, and was there told by Bridges that they were in the sand and that it looked very good, and that they had a slight showing of oil. Bridges testified that he never told either of the Richardsons or any one else that he had struck an oil-bearing sand in the well.

"Bridges was the day driller, and during the night stayed at his home some distance from the lease. In answer to questions propounded by counsel for the defendants, Russell A. Richardson testified that, after Bridges had told him at the well that the sand struck looked very good and had a slight showing of oil, he

went to Wichita Falls in search of Mr. Parks, the superintendent in charge, for the purpose of requesting him to stop the drilling and set the casing for the purpose of testing the sand for oil, but that, after failing to find Mr. Parks, he started back to the well about 10 o'clock at night in company with a friend from St. Louis, a Mr. Potthoff, whom he requested to accompany him. He further testified as follows:

" 'We went out in a Ford. When I got to Dundee, Fred Bridges, head driller, lived at Dundee, he and his wife and a little child that lived there. I drove to the porch, got out, and knocked at the door; Fred come to the door, and spoke to me, and I hadn't been able to find Parks, and I said, "Fred, what do you think about that," and he said, "Mr. Richardson, I cannot talk; you know my position here, I cannot say whether Parks is crooked or not." I am repeating the very words he said, "We have reached the sand, and have got a good showing." Those are the words he told me.'

"Potthoff was also introduced as a witness by the defendant, and testified to the visit to the home of Bridges in company with Russell A. Richardson, and further testified as follows:

" 'He stopped at somebody's place and called them to the door. It was dark, about 11 o'clock in the evening, and it was a small building, small one-story building. We stopped in front of the porch. I heard the conversation between Mr. Richardson and the party that came to the door. We drove in front of the building there, and Mr. Richardson got out of the car and knocked on the door several times, and a man came to the door, and Mr. Richardson said, "Fred," and he said, "Hello, Mr. Richardson." Mr. Richardson said, "What do you think about it?" He said, "Well, I cannot talk to you; you know the position I am in here." He said, "I don't know whether Parks is crooked or not, we are in the sand now that I have been looking for, and got a good showing of oil," and I think that fellow said casing the well and testing the well, and Mr. Richardson asked him if that was the K. M. A. sand, and he said he thought it was.'

"Upon request of counsel for plaintiffs, the jury was instructed by the trial judge that the testimony quoted above by Richardson and Potthoff as to statements alleged to have been made by Bridges at his residence on the occasion of the visit of the witnesses referred to by them could be considered for no other purpose except as tending to impeach the credibility of Bridges as a witness upon the trial."

The Court of Civil Appeals required a remittitur of $1,375. This requirement was complied with by counsel for the drilling company, and the Court of Civil Appeals thereupon affirmed the judgment of the district court. See 246 S. W. 698.

Upon application therefor, the Supreme Court granted a writ of error to the oil company on December 13, 1922.

On March 21, 1923, the Supreme Court granted an agreed motion to dismiss the writ of error as to C. C. Drake, one of the two members of the oil company firm, plaintiff in error here. The motion stated that the said Drake had fully settled with the drilling company as to his liability under the judgment aforesaid.

The controlling question now before the Supreme Court is whether or not the district court erred in giving the following special charge to the jury:

"The witnesses Russell A. Richardson and —— Potthoff have testified to statements made by the plaintiffs witness Bridges at the residence of the said Bridges with reference to the character of sand found in the well and other matters. You are charged that the said testimony cannot be considered by you as in evidence of the truth of the statements imputed to the witness Bridges, and that said testimony can only be considered by you in determining the credibility of the witness Bridges and for no other purpose, and that you will consider said testimony for the purpose above indicated, and give it such weight as you may believe it entitled to under all the circumstances in the case."

To the giving of aforesaid special charge, requested by counsel for the drilling company, the attorneys for the oil company seasonably objected and excepted in part as follows:

"The defendants except to the special issue requested by the plaintiffs, given by the court, limiting the testimony of the witnesses Russell A. Richardson and —— Potthoff as to statements made them by the plaintiffs' witness Bridges regarding the character of sand found. Defendants say that such limitation upon their testimony is unwarranted, and is highly prejudicial to the defendants. In this connection the defendants call the court's attention to the fact that the undisputed evidence of the plaintiff Parks is that he instructed Bridges to at all times acquaint defendants' representatives with what was transpiring at the well, and the testimony of the witness Bridges himself is to the same effect, so that said testimony is admissible as impeaching testimony, and that said testimony is further admissible as a circumstance to show that the plaintiffs conceded (concurred) in a scheme of drilling to the depth of 2,000 feet, regardless of whether an oil sand was encountered."

The evidence limited by the trial court has already been set out by us in our statement of the case aforesaid.

[1, 2] Did the court err in limiting this evidence to impeachment purposes only? We think so, for the question as to whether or not an oil-bearing sand was encountered by the drillers at about 1,800 feet was the main question in this case; statements by Bridges were admissible upon the truth or falsity of the facts in connection with this very issue, and not merely for impeachment purposes. He was the "bureau of information" furnished by the drilling company to Richardson, and his declarations in the line of his duty and with reference to the work he was engaged upon are binding upon his principal, the drilling company. The rule in support of our

holding is practically universal. It has been clearly stated by two authors as follows:

In 1 R. C. L. p. 483, it is said:

"A party undoubtedly may assent beforehand to the truth of what another may state, and by so doing may make the statement his own and be bound by it as fully as though he himself had made it. And, whenever it appears that a party appointed another to speak or act for him, the declaration of the person appointed is admissible against the party." ·

In volume 2, Mechem on Agency, p. 1350, we read:

"It is not at all uncommon for the principal to put an agent in a position in which the making of statements or representations or the giving of information is the act expressly contemplated and directed. Thus, if the principal refers a person to his agent for information, the agent is clearly authorized to give information for the principal upon the subject indicated. If a principal carrying on an extensive business establishes a bureau of information, or designates an agent to whom inquiries may be referred or of whom information may be obtained, the giving of such information or the answering of such inquiries is an act which the principal has directly authorized.

"The giving of information or the answering of inquiries in such a case must, of course, be confined to the subjects which have actually or apparently been confided to him to answer for; but within that sphere persons, expressly or impliedly referred to him, who act in good faith and with reasonable prudence, may rely upon the information as information given by the principal."

The Court of Civil Appeals takes no issue with this principle of law. It expresses no opinion upon it. It merely goes on to say that it was not reversible error to give the special charge limiting the effect of these declarations by Bridges for two reasons.

In the first place, the Court of Civil Appeals says that the charge in question referred, not only to statement by Bridges about the oil-bearing sand, but to other matters, particularly the statement by Bridges that he did not know whether Parks was a crook or not. The Court of Civil Appeals says that certainly it was not error to limit this latter portion of the testimony of Bridges, and that, since the objection of counsel for the oil company was to the charge as a whole, it was insufficient.

[3] But the record shows that the objection by counsel for the oil company was directed to the limitation of statements by Bridges about the sand. The exception did not object to limiting the statement of this witness about Parks. Counsel called the attention of the court and opposing counsel to that portion of this special charge of such opposing counsel which was objectionable to the excepting counsel. Thereupon it became the duty of the district judge to correct the special charge to meet such objection, or have counsel tendering such charge do so.

These counsel, in complaining of their opponents' charge, pointed out specifically that they objected to it because it limited these very statements about the sand. It certainly could not be held to be the duty of counsel for the oil company to go farther and themselves prepare a correct charge giving to the jury a theory of interest only to their opposing counsel. The statute does not require it, and the Court of Civil Appeals does not so hold. We think the latter court failed to observe that objections of counsel were, not to the charge as a whole, but to that portion of it with reference to the discovery of an oil-bearing sand. The court should have amended this charge. His failure to meet these exceptions was properly excepted to, and is here for review. In our judgment this reason presented by the Court of Civil Appeals will not suffice to excuse the giving of this erroneous charge.

[4] But in the second place we are told by the Court of Civil Appeals that some of the court, the number not being stated, are of the further view that the error was harmless, in that there was other evidence of a similar nature in the record. We cannot agree that the record shows the error to be harmless. The oil company was deprived of evidence to which it was entitled; the verdict of the jury was against it on this very issue. It is not made to appear that this additional testimony might not have turned the scale in favor of the oil company. Where an erroneous charge is submitted to the jury, it must rather clearly appear, from the record, that no prejudice resulted to the one erred against in order to avoid a reversal. The record in this case leaves it reasonably doubtful as to whether or not the error was harmful. That being true, the doubt must be resolved in favor of the one against whom the error was committed. See Lamar v. Ry. Co., 248 S. W. 34. In the latter case, pp. 38, 39 of 248 S W., we gave our views at length on a similar situation, and recommended the remand of the cause and another trial.

As we view it, the Court of Civil Appeals has shown no valid reason why the error in submitting this charge should not require a reversal of the judgment herein. The oil company was entitled to have Bridges' statements about the sand go to the jury for all purposes. It was erroneous to limit it to impeachment purposes. This was a closely contested case, and each side was entitled to the full effect of all legitimate testimony. We are clearly of the view that the limiting of this evidence given by Bridges necessitates a new trial of this case.

[5] The application presents but one other assignment, and that is to the effect that the trial court erred in refusing, at the request of counsel for the oil company, to charge the jury that the burden of proof was upon the drilling company to show that

it had not passed through an oil-bearing sand. We think the Court of Civil Appeals, in the state of the evidence in this record, correctly held that it was not reversible error to refuse this charge upon the burden of proof. The Court 'of Civil Appeals treats of this matter on pages 8 and 9 of its opinion (246 S. W. 701).

For the reason already stated, we recommend that the judgments of the district court and Court of Civil Appeals be reversed, and the cause remanded to the former for another trial not inconsistent herewith.

CURETON, C. J. Judgments of the district court and Court of Civil Appeals both reversed, and cause remanded to the district court for trial, as recommended by the Commission of Appeals.