W. G. SCHLEY et al., Appellants,

v.

STRUCTURAL METALS, INCORPORATED, Appellee.

No. 5958.

Court of Civil Appeals of Texas, Waco.

Dec. 20, 1979.

Rehearing Denied March 6, 1980.

---

1. Other than a writ of attachment directed to the Sheriff, this was the only order entered on October 26, 1979.

Stephen F. Lazor, Richard E. Tinsman, Tinsman & Houser, Inc., San Antonio, for appellants.

Hubert W. Green, John T. Reynolds, Green & Kaufman, Inc., San Antonio, for appellee.

HALL, Justice.

Appellee Structural Metals, Inc. (SMI) owns and operates a steel mill near the City of Seguin in Guadalupe County. Scrap metal is melted in electric furnaces and then cooled into ingots which are formed at the mill into saleable products. The mill is in continuous operation.

The electric furnaces are housed in a building known as the "melt shop." The furnaces generate dust and other air pollutants which must be extracted from the melt shop. This is handled by a pollution control system known as "baghouses," which are metal buildings located outside the melt shop. The air from the melt shop is pulled into the baghouses through large steel pipes where the pollutants are filtered out and collected.

In 1973, SMI contracted with Commercial Contracting Company of San Antonio, Inc. (Commercial) for the construction of an additional baghouse to its pollution control system to be known as "C-baghouse." At the time in question in this lawsuit, C-baghouse was under construction by Commercial. It is undisputed that Commercial was an independent contractor on this project.

Under their contract, SMI furnished the plans and specifications and materials for the construction of C-baghouse, and Commercial furnished the labor. SMI also supplied Commercial the use of certain equipment for moving the materials to a fabrication location known as the "monorail" and for removal of the materials from the monorail to the C-baghouse site, and a crane for lifting the heavy fabricated metal pieces into place at the C-baghouse. Eventually in the construction it became necessary for SMI to provide Commercial with a larger crane with a longer boom than was on the original smaller crane provided, in order to lift fabricated materials onto the top of C-baghouse. To fill this need, SMI leased a hydraulic Drott crane from Plains Machinery Company. The Drott crane had been purchased by Plains Machinery from the manufacturer, J. I. Case Company. The Drott crane was delivered to SMI's plant by Plains Machinery on December 3, 1973. After inspection by representatives of SMI and Commercial, the Drott crane was placed near the C-baghouse for use there.

The electricity for SMI's operations is furnished by Guadalupe Valley Electric Cooperative, Inc. (GVEC) by two sets of overhead transmission lines. Each set carries 69,000 volts of electricity. Both sets of lines are energized, but one is a "standby line" in the event the other becomes inoperable. One set approaches SMI's premises from the northeast (the east lines); the other approaches from the northwest (the west lines). Soon after entering SMI's premises, the sets of lines are attached to separate poles. Those poles are 220 feet apart. The east lines then travel overhead in a southwesterly direction 395 feet to a second pole located near the northeast corner of an electrical substation located on SMI's plant premises. The west lines travel overhead 380 feet in a southeasterly direction to a second pole located near the northwest corner of the electrical substation. The poles near the substation are 95 feet apart. From those poles, the lines run directly into the substation. From the substation, the electric lines serving SMI's plant are underground.

In their travels between the poles, both sets of lines cross over a 21-foot-wide paved road on SMI's premises. The road runs east and west along the north side of the main grounds of SMI's mill. The center of the road is 165 feet south of the north pole supporting the east lines, and is 230 feet north of the south pole supporting those lines; and it is 180 feet south of the north pole supporting the west lines, and 200 feet north of the south pole supporting those lines. The east and west lines are 165 feet apart at the points where they cross the center of the paved road. At the time in question in this case there were no signs along the road warning of the overhead lines, no aerial markers on the lines, and no barrier guards on either side of the lines where they crossed the road. However, there were no objects between the road and the lines to obstruct a view of the lines from the road. On the morning of December 3, 1973, W. G. Schley and Clifford Diebel, using the Drott crane, began moving several sections of large steel pipe to the monorail from an area near the road east of the east lines. Their route to the monorail was west along the road, and it carried them under the east lines and the west lines. Each section of pipe they intended to move was forty feet long, six feet in diame-

ter, and weighed 7,800 pounds. The pipe had been furnished by SMI for Commercial's use in construction of C-baghouse; and it had been placed at its location near the road east of the east lines upon the instructions of SMI's supervisor at the time of its delivery to the plant.

Schley and Diebel were employees of Commercial. Diebel was operating the crane from inside its cab. Schley was on the ground and was acting as flagman for Diebel. Schley was Diebel's foreman, and he had helped train Diebel to operate cranes. Schley's duties as flagman were to direct Diebel's movement of the crane by hand signals, and to watch for obstructions which might interfere with the movement of the crane and the pipe down the road. Schley and Diebel completed delivery of one section of pipe to the monorail, and returned for another. Because of the length of the pipe and the location of debris along the road, it was necessary for them to angle the pipe lengthwise with the road. Also, because of its size and weight, the pipe was unwieldy and difficult to move with the crane. Schley and Diebel sought to stabilize it by placing it against the crane. Dalton H. Brandt, a pipefitter for Commercial working under Schley's supervision, apparently saw that Schley and Diebel were having difficulty positioning the second section of pipe for removal down the road, and came to their aid. He arrived just as Schley and Diebel were ready to begin moving the pipe, and he began pushing against the pipe with both hands. Schley was pushing against the pipe with one hand. After the crane had moved "not very far" down the road, "just a few feet or a few yards," the boom of the crane either struck the bottom wire of the east lines, or the boom came sufficiently close to it for electricity to arc from the wire to the boom. Although Diebel, being in the cab of the crane, was not injured, Schley and Brandt suffered severe electrical shock and burns to their bodies. Brandt died enroute to the hospital. Schley survived, but his injuries required the amputation of his left arm at the shoulder and the amputation of both his lower limbs between the ankles and the knees.

Schley filed suit against SMI and J. I. Case for his damages. Gladys Brandt, the widow of Dalton H. Brandt, filed suit individually and as executrix of Mr. Brandt's estate for damages against SMI, J. I. Case, and Plains Machinery. In both cases, SMI filed third-party actions against J. I. Case, Plains Machinery, and GVEC. The cases were consolidated for trial.

Trial of the consolidated case began before a jury on October 31, 1977. Prior to selection of the jury, plaintiffs settled their respective actions against J. I. Case and Plains Machinery, and took nonsuits as to those defendants. In those settlements, Schley received $285,000.00 and Mrs. Brandt received $110,000.00. On November 16, 1977, after plaintiffs had rested their case and SMI's motion for instructed verdict had been overruled, SMI took nonsuits on its actions against J. I. Case, Plains Machinery, and GVEC. The trial then proceeded on plaintiffs' suits against SMI.

Both sets of electric transmission lines were constructed by GVEC for SMI in the late 1950's under a written contract. Although SMI provided the easements across its property for the lines and the electric substation, it is undisputed in the record that the lines and the substation were owned, controlled, and maintained by GVEC. It is also undisputed that after the lines were installed by GVEC the paved road under the lines upon which the accident in question occurred was built by Structural Metals without first consulting GVEC; that at the place of its involvement with the crane boom the bottom line of the east lines was 28.4 feet above the road; and that five, six, or seven years prior to this accident, probably in 1968, the same place on this line was struck by a device known as an "A-frame" while the A-frame was being hauled along the road on a truck. No one was injured in the A-frame incident.

There is proof that SMI had a rigidly enforced rule against the use of cranes for transporting materials down the paved road beneath the lines or anywhere on its prem-

ises without the permission of its supervisors; but there was other evidence that the employees of Commercial were not apprised of the rule, that the rule was not in fact enforced by SMI, and that SMI's employees and employees of independent contractors on the premises frequently used cranes and other equipment for transporting materials along the road under the lines.

GVEC's representative testified that the line in question was ⅜" in diameter. However, a piece of line introduced in evidence by SMI and represented by it to be a part of the line involved in the accident is ½" in diameter. It is made of seven tightly wound strands of aluminum cable. The strands are not painted, but the outside of the line ranges in color from grey to light brown from weathering.

Disputed issues in the case concerned the visibility of the east and west lines; knowledge by Commercial's supervisory personnel, including Schley, of the existence of the lines across SMI's premises and the dangers they posed; knowledge by Commercial's supervisory personnel, especially Schley, of the exact locations where the lines crossed over the road; and whether the lines over the road constituted a dangerous condition. A great deal of proof, which we need not set forth in detail, was devoted to those questions. There was evidence that the lines were difficult to see with the sky in the background; that with the lines overhead out of the normal line of vision, supported by poles located distantly from the road, without aerial markers where they crossed the road, without signs near the road warning of the lines overhead, and without barrier cables supported by poles placed on each side of the road to protect against striking the lines, there was nothing to call one's attention to the lines or their precise location and nothing to warn or protect against the danger of the lines overhead; and that those circumstances created a dangerous condition. On the other hand, there was evidence that the lines were plainly visible to anyone traversing the road; that Schley had worked on the premises on several prior projects and had passed under the lines at the scene of the accident at least ten times a week as he entered and left the plant; that Commercial's supervisors, including Schley, had been warned by SMI of the dangers posed by high voltage lines on the plant premises; and that on a prior occasion, the west lines were expressly pointed out to Schley by SMI's supervisor.

Another disputed issue in the case was whether Frank Taylor, SMI's supervisor in charge on the day of the accident, had denied Schley the use of a forklift for moving the pipe and had told Schley to use the Drott crane for that purpose.

Among other pleadings in plaintiffs' petitions, they alleged that SMI was guilty of negligence proximately causing the collision (a) in failing to place warning signs of the high voltage lines close to the lines where the accident occurred; (b) in failing to place a barrier cable on either side of the high voltage lines where the lines came over the road at the place of the accident; (c) in failing to place aerial markers on the lines where they crossed the road at the accident site; (d) in failing to place the lines underground at the point where they crossed the road where the accident occurred; and (g) in failing to provide a forklift to move the pipe and in directing Schley to move the pipe by means of the Drott crane; and that "having the unguarded, unmarked and unwarned of high voltage lines, as set out above, created a dangerous condition on the premises of which condition Defendant knew of, or should have known of."

In its answers to plaintiffs' petitions SMI alleged among other defenses that Commercial and its employees, including Schley and Brandt, had previously performed similar construction work at SMI's plant site; that, accordingly, Commercial, its supervisors and employees, including Schley and Brandt, were thoroughly familiar with the plant site, the physical location of buildings and improvements, roads and passageways, electrical plant, and all high voltage lines crossing over the premises and terminating at the plant site; that Schley and Brandt had knowledge and appreciation of the dangers inherent in high voltage lines and the

use of cranes in close proximity thereto; that each was guilty of negligence proximately causing the accident (b) in failing to keep a proper lookout for the overhead high voltage lines, (c) in failing to direct the boom of the crane to a lowered position so as to avoid the high voltage lines, (d) in failing to give proper instructions and warnings for the movement of the crane to the driver, (f) in failing to notify SMI that the crane would be operated in close proximity to high voltage lines, and (i) in failing to use a forklift, truck or other authorized vehicle to move the steel pipe; that both Schley and Brandt had actual knowledge of the presence of the high voltage lines at the time of the accident, fully appreciated the danger in contacting the lines with the crane boom, and voluntarily encountered and assumed the risk of that danger; that the conditions of the high voltage lines were entirely open and obvious, were not hidden or latent dangers, and the dangers inherent therein were as well known to Schley and Brandt as they were to SMI; that prior to commencing the work on the baghouse, the high voltage lines crossing over the road were pointed out and identified to "Commercial's representatives, supervisors and foremen (including the Plaintiff, Schley, himself)," and they were warned and instructed that the crane was not to be used in that area and that it was not to be used to convey materials elsewhere in the plant, and that Commercial had the duty to convey those warnings and instructions to its workmen and to take any necessary precautions concerning any dangers on the premises with which they were fully aware.

The case was submitted to the jury on November 29, 1977. The jury made the following answers to the special issues:

1. Found that SMI maintained a dangerous condition "by allowing the high voltage lines in question to cross above a paved road on its premises in the condition that existed at the time of the accident."

   In connection with this issue, the court instructed the jury that a dangerous condition is "a condition presenting an unreasonable risk of harm to persons invited on the premises," and that an unreasonable risk of harm is "one in which there is a sufficient probability of a harmful event occurring that a reasonably prudent person would have foreseen it or some similar event is likely to happen."

2. Found that SMI knew or should have known that this dangerous condition existed at the time of the accident.

3. Found (a)(1) that SMI was negligent in failing to place warning signs close to the high voltage lines that crossed over the road at the accident site, but failed to find (a)(2) that such negligence was a proximate cause of the accident; and failed to find (b)(1) that SMI was negligent in failing to place a barrier guard on either side of the high voltage lines which crossed the road at the accident site.

4. Found that GVEC would have placed aerial markers on the high voltage lines which crossed the road at the accident site if SMI had requested the markers and had agreed to pay for the cost of installation.

5. Found (a)(1) that SMI was negligent in failing to request and agreeing to pay for placing aerial markers on the high voltage lines, but failed to find (a)(2) that such negligence was a proximate cause of the accident.

6. Found that GVEC would have placed the high voltage lines underground at the point where they crossed the road at the accident site if SMI had requested the same and had agreed to pay for the cost of the installation.

7. Found (a)(1) that SMI was negligent in failing to request and agree to pay for placing the high voltage lines underground, and found (a)(2) that such negligence was a proximate cause of the accident.

8. Found that SMI's supervisor, Frank Taylor, directed Schley to use the Drott crane for moving the pipe and refused Schley the use of the fork-lift.

9. Failed to find (a)(1) that SMI was negligent as the result of Taylor's actions in directing Schley to use the crane and in refusing the use of the forklift.

10. Failed to find that Schley had adequate knowledge of the danger of the high voltage lines in question prior to the accident.

In connection with this special issue (and also with special issues 14 and 18, infra) "adequate knowledge of the danger of the high voltage lines" was defined by the court to mean "that the person in question actually knew of the existence of the high voltage lines in question, that they were charged with high voltage electricity, and actually and fully appreciated the nature and extent of the danger of operating a crane boom in close proximity to such lines."

11. Failed to find that Schley received an adequate warning from SMI personnel of the danger of the high voltage lines in question prior to the accident.

In connection with this special issue (and also with special issues 15 and 19, infra) "adequate warning" was defined by the court to mean "that the person receiving the warning was actually informed of the existence of the high voltage lines in question, that they were charged with high voltage electricity, and of the nature and extent of the danger of operating a crane in close proximity to such high voltage lines."

12. Found that on the occasion in question Schley was negligent (a)(1) in failing to keep a proper lookout for the high voltage lines in question, (b)(1) in failing to direct the boom to a lowered position before it moved under the high voltage lines, and (c)(1) in failing to give a warning of the presence of the high voltage lines to the crane operator; and found (a)(2), (b)(2), and (c)(2) that in each instance the negligence was a proximate cause of the accident; but failed to find that Schley was negligent (d)(1) in failing to notify SMI that the crane would be operated in close proximity to the high voltage lines and (e)(1) in failing to use a forklift to move the pipe under the high voltage lines.

13. Found that as between Schley and SMI negligent causation for the accident was attributable 35% to Schley and 65% to SMI.

14. Failed to find that Dalton Brandt had adequate knowledge of the danger of the high voltage lines in question prior to the accident.

15. Failed to find that Brandt received an adequate warning from SMI personnel of the danger of the high voltage lines in question prior to the accident.

16. Failed to find that Brandt was negligent (a)(1) in failing to keep a proper lookout and (b)(1) in failing to warn the crane driver of the presence of the high voltage lines.

17. Found that as between Dalton Brandt and SMI negligent causation for the accident was attributable 0% to Brandt and 100% to SMI.

18. Found that supervisory personnel employed by Commercial had adequate knowledge of the danger of the high voltage lines in question prior to the accident.

(See special issue 10 for the definition of "adequate knowledge" submitted in connection with this issue).

19. Failed to find that supervisory personnel employed by Commercial received an adequate warning from personnel employed by SMI of the high voltage lines in question prior to the accident.

20. Found that $1,500,000.00 would fairly and reasonably compensate Schley for his damages.

21. Found that $5,000.00 would have fairly and reasonably compensated Dalton Brandt for his physical pain and mental anguish.

22. Found that Mrs. Brandt's pecuniary loss was $250,000.00.

The jury's verdict was received by the court and filed with the clerk on December 2, 1977.

SMI moved for judgment that plaintiffs take nothing. It was asserted in the motion that because of the jury's finding in answer to special issue 18 (that supervisory personnel of Commercial had adequate knowledge of the high voltage lines and appreciated the danger) SMI owed no additional duty to Schley and Brandt, employees of Commercial, under the holding in *Delhi-Taylor v. Henry*, (Tex.1967) 416 S.W.2d 390. SMI also asserted it was entitled to the take-nothing judgment against plaintiffs because the only findings which could support a judgment for plaintiffs were the findings in answer to special issues 6 and 7 (that SMI negligently caused the accident by failing to request, and agree to pay for, GVEC to place the high voltage lines underground); and that those issues should not have been submitted and their answers should be disregarded because SMI was under no legal duty to request GVEC to place the lines underground, there were no pleadings to support the submissions of the issues, and the answers to the issues were not supported by any evidence.

Plaintiffs filed a motion for judgment in which they asserted that "knowledge and appreciation of the dangerous condition by the plaintiffs' employer . . . is no longer a defense." Plaintiffs also moved the court to disregard the jury's answer to special issue 18 on the ground "that the doctrine enunciated in *Delhi-Taylor v. Henry* . . . is no longer good law after the adoption of comparative negligence in Texas."

On January 12, 1978, the court rendered judgment that plaintiffs take nothing against SMI. The judgment recites that the court had determined that plaintiffs' motion for judgment and motion to disre-gard jury finding should be denied; that SMI's motion for judgment should be granted; and that "Defendant is entitled to judgment (1) based upon the jury's answer to Special Issue No. 18, and (2) because the jury's answers to Special Issues Nos. 6 and 7 will not support a judgment for the Plaintiffs, and (3) because the Court should disregard the answers to Special Issues Nos. 6 and 7 because they are not supported by the evidence."

Plaintiffs' amended motion for new trial, filed on February 8, 1978, was overruled by written order on March 9, 1978. Plaintiffs filed their appeal bond on March 21, 1978.

The primary questions raised by the parties for our decision are whether the court acted correctly (1) in refusing to disregard the jury's answer to special issue 18, and (2) in disregarding the answers to special issues 6 and 7.

### Special Issue 18

■ In *Delhi-Taylor v. Henry*, (Tex.1967) 416 S.W.2d 390, 394, our Supreme Court enunciated the following rule:

"While an [occupier of land] owes a duty to employees of an independent contractor to take reasonable precautions to protect them from hidden dangers on the premises or to warn them thereof, an adequate warning to or full knowledge by the independent contractor of the dangers should and will be held to discharge the landowner's alternative duty to warn the employees."

In *Delhi-Taylor*, the Court recognized that its holding was "diametrically opposed to the holding made in *Galveston-Houston Elec. Ry. Co. v. Reinle*, 113 Tex. 456, 258 S.W. 803 (1924)," and it overruled the *Reinle* decision. In that case, Reinle, an employee of an independent contractor performing services for Galveston-Houston Electric Ry. Co., was electrocuted when a boom he was operating came in contact with, or in close proximity to, an uninsulated high voltage wire. The holding was made in *Reinle* that "it was the duty of the interurban company to exercise ordinary care to give Reinle notice or warning of the

danger of the boom coming in contact with, or in close proximity to, the uninsulated high-voltage wires, notwithstanding Reinle was an employee not of the interurban company, but of the independent contractor, who possessed full knowledge of the danger." (258 S.W. 806). In overruling the rule in *Reinle* and adopting the opposite rule, the Court reasoned as follows in *Delhi-Taylor*:

"On many projects there are a number of independent contractors, each employing scores of workmen. The identities of some of the workmen will change from day to day. To impose the duty on the owner or occupier of the premises to know and to warn every workman on the project of a dangerous condition would subject him to an impossible burden. Moreover, an independent contractor owes a duty to his employees to warn them of dangers on the premises where they are required to work which are known to him. This duty was recognized in *Reinle*. 258 S.W. 803, 805. The owner or occupier should not be required to foresee and anticipate that the contractor will not discharge his duty to his own employees, and there is no sound basis for requiring that the employees should be twice warned." (416 S.W.2d 394).

In our case, special issue 18 submitted SMI's defense under the *Delhi-Taylor* doctrine of "no duty" to Schley and Brandt related to the dangers posed by the high voltage lines over the road based upon SMI's contention of knowledge of the dangers by Commercial's supervisors; and it resulted in a finding favorable to SMI.

Since the legislature's enactment in 1973 of the comparative negligence statute (Tex. Civ.St. art. 2212a; Acts 1973; 63rd Leg., p. 41, ch. 28, §§ 1, 2, eff. Sept. 1, 1973) our Supreme Court "has sought to abolish those doctrines directed to the old choice between total victory and total defeat for the injured plaintiff," *Davila v. Sanders,* (Tex. 1977) 557 S.W.2d 770, 771, because such doctrines are "incompatible with the legislative purpose of the comparative negligence statute." *Parker v. Highland Park, Inc.,*

(Tex.1978) 565 S.W.2d 512, 518. In *Parker*, the "no-duty" concept in occupier-invitee cases was abolished. See also, *Farley v. M M Cattle Company*, (Tex.1975) 529 S.W.2d 751, 758 (doctrine of voluntary assumption of risk abolished); *Davila v. Sanders*, supra (doctrine of imminent peril abolished); *French v. Grigsby*, (Tex.1978) 571 S.W.2d 867 (doctrine of discovered peril abolished).

Plaintiffs argue, as they did in the trial court, that the *Delhi-Taylor* doctrine spells total victory or total defeat for the plaintiff, and that accordingly the doctrine lost its viability with the enactment of the comparative negligence statute. They also argue that in any event the "no duty" rule was discarded by the Supreme Court in *Farley v. M M Cattle Company*, supra, citing *Thornal v. Cargill, Inc.*, 573 S.W.2d 845 (Tex.Civ.App.—Beaumont 1978; writ granted, judgment reformed to provide for post-judgment interest, [Tex.1979] 587 S.W.2d 384), in support of that proposition. It is true that the majority of the Court of Civil Appeals in *Thornal*, based upon certain statements of the Supreme Court in *Parker*, supra, reached the conclusion that "no duty" was completely abolished in *Farley*. Nevertheless we agree with the reasoning set forth in the dissent in *Thornal*, which need not be restated here, for our conclusion that the doctrine of "no duty" as applied to the type of case now before us was not abolished until the Supreme Court's decision in *Parker*. Our conclusion is buttressed by the fact that the rule in *Delhi-Taylor* was recognized as still viable, but not applicable in a products liability case, in *Rourke v. Garza*, (Tex.1976) 530 S.W.2d 794, 800–801, decided after *Farley*.

The facts recited in the Supreme Court's opinion in *Parker* reflect that plaintiff Mrs. Parker was injured when she fell while descending a dark stairway located on the premises of defendant Highland Park, Inc. Judgment for Mrs. Parker in the trial court was based upon jury findings that the stairs were not properly lighted, which caused an unusually dangerous condition; and that Highland Park's failure to properly light the stairs was negligence, and a proximate

cause of Mrs. Parker's injuries. The jury failed to find that Mrs. Parker was negligent in undertaking to descend the stairs or in the manner in which she descended the stairs, but found that she received a warning of the danger as she proceeded down the stairs. The Court of Civil Appeals reversed the trial court judgment "squarely upon the holding that the defendant owed the plaintiff no duty since the darkness in the stairwell was open and obvious to Mrs. Parker." (565 S.W.2d 513). The Supreme Court abolished the no-duty rule, reversed the Court of Civil Appeals' decision, and affirmed the trial court's judgment.

SMI contends, as it did in the trial court, that the rule in *Delhi-Taylor* has survived *Parker*. SMI correctly asserts that in *Parker* the court was not confronted with the intervening activity of an independent contractor or the claim of duty discharged under *Delhi-Taylor* and did not mention the Delhi-Taylor case. SMI then argues that the *Delhi-Taylor* doctrine is not equivalent to the "no duty" concept discarded in *Parker*; and that the policy reasons assigned by the court in Delhi-Taylor for adopting the rule of that case are still valid. SMI argues as follows: "Unquestionably, plaintiffs' cause of action is based upon the assumption that defendant had a duty to warn plaintiffs (Special Issues 3, 4 and 5). Therefore whatever relevance knowledge of the danger may have to plaintiffs' negligence, that same knowledge on the part of the *employer* will trigger the employer's duty to his workmen and will discharge defendant's duty. A similar principle is relied upon by plaintiffs to establish landowner negligence: defendant's duty is triggered by the jury's findings that *defendant* had *knowledge* of the dangerous condition (Special Issues 3, 4, and 5, 6 and 7, conditioned upon affirmative answers to Special Issues 1 and 2)."

After announcing in *Parker* that the no-duty concept in occupier-invitee cases was abolished, the court said:

"There are many instances in which a person of ordinary prudence may prudently take a risk about which he knows, or has been warned about, or that is open and obvious to him. His conduct under those circumstances is a matter which bears upon his own contributory negligence. . . .

. . . . .

"A plaintiff's knowledge, whether it is derived from a warning or from the facts, even if the facts display the danger openly and obviously, is a matter that bears upon his own negligence; it should not affect the defendant's duty. A plaintiff may be contributorily negligent as a matter of law by reason of his conduct after he possesses knowledge of the condition. A condition that is open and obvious is proof of knowledge and appreciation as a matter of law, . . . but that phrase is not 'a separate concept'. . . . In a case that is controlled by the comparative negligence statute, a plaintiff's contributory negligence that is established as a matter of fact or as a matter of law must then be compared with the negligence of the other parties, assuming that there is a finding of proximate cause in each instance." (565 S.W.2d 520–521).

To hold that the *Delhi-Taylor* doctrine survived *Parker* would result in the following incongruity: The injured workman who confronted an open and obvious hazard or one of which he had personal knowledge would not automatically be barred from recovery; he would be able to go to the jury under principles of contributory negligence. However, the injured workman who did not have personal knowledge of the dangerous condition by warning or by other circumstance would be barred from recovery by the fact that his employer knew of the condition. The landowner who personally warned the injured workman of the dangerous condition or who had a dangerous condition on his premises that was open and obvious would not automatically be entitled on those facts to a defense verdict, but if the landowner did nothing and the workman's employer happened to know of the dangerous condition, or if the landowner warned only the workman's supervisor, the landowner would be entitled to a com-

plete defense verdict. The landowner who warned one supervisor would fare better than one who warned each individual workman but no supervisors. We cannot believe the *Parker* decision was intended to create a set of rules whereby knowledge of a dangerous condition by supervisory personnel of the injured workman would bar recovery, but personal knowledge by the workman would not; and it is our view that the *Delhi-Taylor* rule was necessarily set aside by *Parker*. See, also, *Downs v. J. M. Huber Corp.*, 580 F.2d 794 (5th Cir. 1978); *Bullington v. Texas Elec. Service Co.*, 570 F.2d 1272 (5th Cir. 1978); *Hendrix v. Jones-Lake Const.*, 570 S.W.2d 546 (Tex.Civ.App.—Corpus Christi 1978, writ ref'd n.r.e.); *Thornal v. Cargill*, 573 S.W.2d 845 (Tex.Civ.App.—Beaumont 1978) both the majority and dissenting opinions; and the per curiam opinion of the Supreme Court on writ of error in *Thornal v. Cargill*, (Tex.1979) 587 S.W.2d 384.

*Parker's* application in our case.

The trial court's judgment in our case was rendered on January 12, 1978. Plaintiffs' motion for new trial was overruled by written order on March 9, 1978. Appeal bond was filed by Plaintiffs on March 21, 1978. The Supreme Court's decision in *Parker* was rendered on February 8, 1978. The Court said:

We now expressly abolish the so-called no-duty concept in this case and, as expressed in Farley, "henceforth in the trial of all actions based on negligence . . ." The reasonableness of an actor's conduct under the circumstances will be determined under principles of contributory negligence. While this case arose prior to the adoption of the comparative negligence statute, in the trial of cases under that statute, one who is contributorily negligent is still entitled to have his negligence compared with that of the other participants in the event.

Rehearing was denied in *Parker* on March 15, 1978.

SMI contends that even assuming *Parker* overruled *Delhi-Taylor*, the application of *Parker* to our case would be retroactive;

and that it is clear from the Court's statement "we *now* expressly abolish . . . and . . . *henceforth* in the trial of all actions" that the decision was intended to be only prospective and to apply only to a "complete trial" beginning thereafter. Conversely, plaintiffs assert the *Parker* decision was intended to be retroactive and that it was in fact applied retroactively in *Parker*. Plaintiffs also assert that its application to our case would not be retroactive because our case was "in trial" when the decision was announced by the Supreme Court as the law of this State on February 8, 1978. We agree with plaintiffs' second proposition, and we therefore do not reach the question of retroaction.

In *Lawyers Lloyds of Texas v. Webb*, 137 Tex. 107, 152 S.W.2d 1096 (1941), the Court was called upon to construe the term "actual trial" as used in Vernon's Tex.Civ.St. art. 2249a, which provides as follows: "Section 1. No party who participates either in person or by his attorney in the actual trial of the case in the trial court shall be entitled to review by the Court of Civil Appeals through means of writ of error." The Court said (at 152 S.W.2d 1097):

It will be noted that the statute above quoted does not undertake to take away the right of appeal by writ of error entirely. It denies that right only to one "who participates either in person or by his attorney in the *actual* trial of the case." Ordinarily, the "trial" includes every step taken in the determination of the issues between the parties, and therefore includes the hearing on a motion for new trial. *Gulf, C. & S.F.R. Co. v. Muse*, 109 Tex. 352, 207 S.W. 897, 4 A.L.R. 613; *Pratley v. Sherwin-Williams Co. of Texas*, Tex.Com.App., 36 S.W.2d 195. But by the use of the term "actual trial" the Legislature evidently intended to limit or restrict the meaning of the word "trial." The *actual trial* of a case, as ordinarily understood by the legal profession, is the hearing in open court, leading up to the rendition of judgment, on the questions of law, if the case is disposed of on the questions of law, or on the questions of

fact, if the final judgment is rendered on the facts.

In the *Muse* case, cited in *Lawyers Lloyds of Texas v. Webb*, the Supreme Court said it is a "thoroughly established principle" that "ordinarily the jurisdiction of a court over both subject-matter and parties, once fully attached in a cause, continues until all issues both of fact and of law have been finally determined." (207 S.W. 898).

SMI's "complete trial" argued for the application of *Parker* carries the same meaning as the term "actual trial" held in *Lawyers Lloyds of Texas v. Webb* to be a limited or restricted use of the word "trial." Also, SMI's application of *Parker* to a "complete trial" beginning after *Parker* is akin to the *"Sunburst"* doctrine of "adhering to precedent for the particular case but dogmatically announcing that the rule will be different hereafter, and stating what the new holding shall be. *Great Northern Ry. Co. v. Sunburst Oil & Ref. Co.*, 287 U.S. 358, 53 S.Ct. 145, 77 L.Ed. 360 (1932)." (Per Greenhill, J., concurring in *Watkins v. Southcrest Baptist Church*, [Tex.1966] 399 S.W.2d 530, at page 536). We do not believe that either contention is correct.

It cannot be argued that the no-duty rule was not abolished *instanter* in *Parker*. The Court said "We *now* expressly abolish the so-called no-duty concept." (Italics ours.) The summary nature of the ruling is also shown by the fact that the Court did not use the *"Sunburst"* approach, but applied the new rule to the case under consideration. Moreover, the court did not say that its decision would apply only to "complete trials" beginning thereafter, but stated that no-duty was abolished *"henceforth* in the *trial* of all actions based on negligence." (Emphasis ours). We believe that by the use of the word "trial" rather than the more limited term "actual trial," coupled with the summary nature and application of its ruling, the Court intended that its decision should immediately apply in all negligence actions, including those then in trial, regardless of their stage of development.

SMI asserts that in any event the trial court's judgment, rendered on January 12, 1978, was an "errorless judgment" insofar as it was based upon the no-duty rule of *Delhi-Taylor*, and that it could not be subject to the decision in *Parker*, rendered on February 8, 1978, unless *Parker* was retroactive. We disagree. Although the judgment dated January 12, 1978, eventually became the final judgment in the trial court, it was not final when rendered and would not become final until after plaintiffs' amended motion for new trial was overruled on March 9, 1978, after the *Parker* decision. Plaintiffs' amended motion for new trial assigned error to the court's failure to grant plaintiffs' motion to disregard the jury's answer to special issue 18; and it also assigned error to the submission of the issue on the ground that it was not a controlling issue after the adoption of comparative negligence in Texas. The record also shows that after *Parker*, but before plaintiffs' amended motion for new trial was overruled, counsel for the parties submitted written briefs and arguments to the trial court setting forth their positions regarding *Parker's* effect on the rule in *Delhi-Taylor* and its application to this case. If we correctly interpret *Lawyers Lloyds* and *Muse*, supra, then the question of the validity *vel non* of the *Delhi-Taylor* doctrine as a basis for final judgment in our case was squarely before the trial court for decision when the doctrine was discarded by the holding in *Parker*. The trial court should have followed *Parker* and disregarded the answer to special issue 18 as a basis for the judgment, rather than overruling the complaint in plaintiffs' motion for new trial on that question.

■ Rule 506, Vernon's Tex.Rules Civ. Proc., provides that the judgment of the Supreme Court "shall be final at the expiration of fifteen days from the rendition thereof, when no motion for rehearing has been filed." Under this Rule, SMI argues that the *Parker* decision was not effective until March 15, 1978, when rehearing was denied therein, after the trial court in our case had overruled plaintiffs' motion for new trial on March 9, 1978, and that accordingly the trial court correctly followed *Del-*

*hi-Taylor* as the law of the case. We reject this argument for two reasons: First, because of the summary nature of the decision we believe the Supreme Court intended that *Parker* should be immediately effective, subject of course to future actions of the Court. *Parker* has not been overruled. Second, under the provisions of Rule 329b § 5, the trial court retains jurisdiction over the cause and therefore plenary power over its judgment until thirty days after the original or amended motion for new trial is overruled. "During the pendency of the motion for new trial and the thirty day period following its overruling, the court has the power to vacate, modify, correct, or reform the judgment or to grant a new trial. *Transamerican Leasing Company v. Three Bears, Inc.*, (Tex.1978) 567 S.W.2d 799, 800. In our case, the trial court did not lose jurisdiction until April 8, 1978, more than three weeks after motion for rehearing was overruled in *Parker*.

### Special Issues 6 and 7.

Answering special issue 6, the jury found that GVEC "would have placed the high voltage lines in question underground at the point where they crossed the road at the accident site if [SMI] had requested the same and had agreed to pay for the cost of installation." In the answers to special issue 7, the jury found that SMI was negligent "in failing to request and agree to pay for placing the high voltage lines in question underground where they crossed the road at the accident site," and that such negligence was "a proximate cause of the occurrence in question."

Prior to submission of the case to the jury, SMI objected to special issues 6 and 7 on the grounds that they were not supported by pleadings or evidence; and it also objected to special issue 7 on the ground of "no duty . . . because under the undisputed evidence the power lines were under the exclusive control of [GVEC]." After verdict, in its amended motion for judgment, SMI moved the court to disregard the jury's answers to special issues 6 and 7 on these four grounds: (1) The findings were

immaterial in view of the answer to special issue 18; (2) there was no evidence to support the findings; (3) as a matter of law, there was no legal duty on the part of SMI to request GVEC to place the lines underground; and (4) there were no pleadings to support the submission of the issues.

As we stated previously, in the judgment the trial court recited that SMI's motion for judgment was granted and the answers to special issues 6 and 7 were disregarded "because [they] will not support a judgment for the Plaintiffs, and because . . . they are not supported by the evidence." Plaintiffs assign error to those rulings.

■ It is the duty of an appellate court to sustain the judgment of the trial court if it is correct on any theory of law applicable to the case, "and that regardless of whether the trial court gives the correct legal reason for the judgment he enters, or whether he gives any reason at all." *Gulf Land Co. v. Atlantic Refining Co.*, 134 Tex. 59, 131 S.W.2d 73, 84 (1939); *Custom Leasing, Inc. v. Texas Bank & T. Co. of Dallas*, (Tex. 1974) 516 S.W.2d 138, 142. Under that rule it is our duty to affirm the trial court's action in disregarding the answers to special issues 6 and 7 if it was valid for any of the reasons assigned therefor in SMI's amended motion for judgment. We hold that none of those reasons are supported by the record.

*Immateriality.* In the light of our holding on special issue 18, the findings in question were material findings.

■ *Evidence for the findings and duty.* When the substation was constructed by GVEC in the 1950's, GVEC would have placed it wherever SMI wanted it, even north of the eventual location of the paved road. SMI selected the location of the substation as the one most feasible for servicing its plant. The location of the substation necessarily entailed the location of the high voltage lines "in and out" of it. The lines leaving the substation are buried. SMI constructed the paved road in question under the high voltage lines without consulting or seeking permission from GVEC. We

have already noticed the evidence showing that cranes and other equipment were used frequently to haul materials along the road, that SMI did not install line barriers or warning signs on its premises near the lines nor request GVEC to place aerial markers on the lines, and that in 1968 an A-frame on a truck struck the east lines at the identical location of the accident in question. It was SMI's position on the trial that although line barriers, warning signs and aerial markers could have been installed at small expense, they would not have contributed to the safety of the premises, but would have operated to lull the workers into a dangerous reliance upon them rather than upon personal lookout for the lines.

SMI's safety director admitted that a 69,000 volt line is something that has a great deal of risk with it, and that anyone coming into contact with it likely would be killed or seriously maimed. Plaintiffs' safety expert testified that incidents of contact between high voltage electric lines and equipment like cranes are not rare; that "literally thousands" of such accidents occur every year; and that when cranes and other equipment that have the capability to get into power lines are operated on a road crossed by overhead lines, "sooner or later you are going to have a contact." There was a great amount of testimony concerning the inability of crane operators and men on the ground to judge the height of the power lines and the distance between a crane's boom and the lines. For examples, SMI's general manager, who had been employed by SMI for 16 years, erroneously estimated the height of the wires to be thirty or forty feet, and then explained his error by saying that he "did not participate in the construction of the lines and never had the opportunity or reason to measure them"; and SMI's expert witness on the operation of cranes testified that it is difficult to accurately judge the distance between the end of the crane's boom and a high line. Plaintiffs' expert witness testified to the same effect and said that while the lines may be quite close, the crane operator or other people on the ground "have a feeling they are quite far away." GVEC's

general manager testified that the only safeguard against a 69,000 volt line other than maintaining clearance is to bury the line. Plaintiffs' expert witness testified that the danger of the high voltage lines could be removed by locating the lines remotely from the road and from areas where equipment would be working, or by placing the lines underground. He said that where equipment is continuously passing under the lines the second best thing to de-energizing the line on each trip of the equipment is to bury it. SMI's general foreman testified that in view of the fact that material was transported back and forth on the road in question "many times every day . . . it would be impossible to cut the power off every time a vehicle passed under those lines."

The lines entering the SMI plant were constructed solely to provide power for SMI. SMI is the only customer of GVEC that has 69,000 volt lines going directly into the plant. The lines and the substation are located on land belonging to SMI. SMI is the largest of GVEC's 12,000 customers, and accounts for 30% of GVEC's gross revenues. During 1973, the year of the occurrence in question, GVEC's gross revenues totaled about $3,500,000.00. The evidence establishes that with techniques available after 1966, both sets of 69,000 volt lines servicing SMI could have been buried completely from their entrance onto SMI's property to the substation for approximately $60,000.00. SMI's counsel stated in his argument to the jury, while purporting to speak to plaintiffs' counsel, "I guarantee you Mr. Selig [the vice-president and general manager of SMI] would spend far more than $60,000.00 if he had known it would save the life of Mr. Brandt and avoid this tragic accident to Mr. Schley."

GVEC's general manager testified that in the past, whenever SMI made a request related to the lines, GVEC generally granted the request. SMI's general manager testified that he could think of "many things that we've requested that they [GVEC] have refused to do even if we paid for it"; but when asked immediately there-

after, "Anything in connection with warning signs or safety?" he answered: "No sir. I can't think of anything with regard to safety or warning signs." The evidence reflects that when the lines were under construction, GVEC, on SMI's request, altered its plans and specifications and increased the height of the lines over a railroad on SMI's premises.

In summary, the evidence shows a dangerous condition created and maintained by SMI on SMI's premises; that an accident like the one in question was a foreseeable consequence of the condition; that the only reasonable means available for correcting the condition was placing the lines underground; that the lines could have been buried completely across SMI's premises at the cost of $60,000.00, less than the average cost to SMI of one month's electricity from GVEC during 1973; that SMI considered $60,000.00 a reasonable expenditure for preventing accidents like the one in question; that GVEC's general manager recognized that burial of the lines and maintaining clearance were the only safeguards against the lines; and that GVEC generally granted SMI's requests relating to the lines, and had never refused any safety-related request. We hold the evidence is legally sufficient to establish a duty on the part of SMI prior to the accident in question to request GVEC to place the lines underground and to agree to pay for that installation; and we also hold that the evidence is legally sufficient to support the jury's answers to special issues 6 and 7.

*Pleadings.* Special issues 6 and 7 were based upon plaintiffs' allegations that SMI was guilty of negligent causation "In failing to place said lines underground at the point where they crossed the road where the accident in question occurred." Plaintiffs say that pleadings by them of the *means available to SMI for having the lines* placed under the road it constructed (request GVEC, agree to pay) would have been evidentiary allegations, not necessary to be pleaded; and they argue that their pleading gave SMI fair notice that it should be prepared to defend its conduct in failing to have the lines placed underground where

they crossed the road. SMI contends that the pleading of "failure to place" the lines underground and the submission in the special issues of "failure to request" the owner and custodian of the lines to place then underground presented separate duties and theories of recovery; that "having tried and having rebutted the charge of breach of duty *to place* . . . defendant was not on fair notice of the claim of breach of duty in failing *to request*"; that plaintiffs "shifted theories" after the evidence showed without dispute that GVEC owned and controlled the lines; and that "since plaintiffs' shift in theory occurred after the close of the evidence, defendant was misled to its prejudice, and was precluded from fairly defending the claim."

■ Pleadings are sufficient if they give fair notice to the opponent of the proof which will be introduced against him at trial. Rules 45 and 47, Vernon's Tex.Rules Civ.Proc.; *Osteen v. Crumpton*, 519 S.W.2d 263, 265 (Tex.Civ.App.—Dallas 1975, writ ref.). "In order for a variance to be fatal it must be substantial, misleading and prejudicial departure from the pleading." *Stone v. Lawyers Title Ins. Corp.*, (Tex.1977) 554 S.W.2d 183, 187.

■ In 2 McDonald, Texas Civil Practice (1970 Rev.), pp. 14–16, Pleading § 5.05, it is stated that a pleading may fail to give fair notice because of ambiguous language which does not clearly convey the pleader's contentions, "or because its allegations, though clearly expressed, may mislead the opponent as to the theory upon which the pleader proposes to rely. Two competing factors will be balanced by the judge in determining whether a pleading meets the requirements: first, the intent of the rules to eliminate technicality and to simplify pleading; secondly, the fact that a fair trial is impossible unless both parties are aware of the basic controversy to be settled. . . The judge applies a standard of convenience and fairness, bearing in mind the positions of the parties and such pertinent factors as their means of knowledge of the facts and access to the necessary evidence. . . .

The test should be whether an opposing attorney of reasonable competence, with the pleadings before him, can ascertain the nature and the basic issues of the controversy and the testimony probably relevant." The test recommended in *McDonald* was recognized and applied in *Rodriquez v. Yenawine*, 556 S.W.2d 410, 414 (Tex.Civ.App. —Austin 1977, writ ref'd n.r.e.); *and Daniels v. Conrad*, 331 S.W.2d 411, 415 (Tex.Civ. App.—Dallas 1959, writ ref'd n.r.e.).

Plaintiffs' pleaded claim for relief centered on a dangerous condition allegedly created and maintained by SMI by the construction of a paved road under high voltage lines without line barriers, aerial markers, or warning signs. In that frame, plaintiffs alleged that SMI was negligent in failing "to place" the lines under the road. SMI answered that it "had no right of control" over the lines, which were "erected and maintained" by GVEC. This allegation of "no right of control" over the lines was not entirely correct insofar as burial of the lines was concerned. We have previously noticed that SMI's contract with GVEC required SMI to provide GVEC the easements for the high voltage lines and the substation; and that SMI selected the location of the substation and thereby the location of the lines to the substation. Under the contract, the placement of the lines under the paved road would have depended in part upon SMI's willingness or not to provide an underground easement on its premises to GVEC for that purpose.

Rule 45 provides "All pleadings shall be so construed as to do substantial justice." It is also the rule that in the absence of special exception, the pleading will be liberally construed in the pleader's favor. *Stone v. Lawyers Title Ins. Corp.*, (Tex.1977) 554 S.W.2d 183, 186; *Scott v. Gardner*, 137 Tex. 628, 156 S.W.2d 513, 515 (1941). SMI did not except to the pleading in question. With knowledge by SMI of its duty to provide the easement for the lines and of the circumstances of the accident in question, we believe that in the light of the full text of plaintiffs' petitions SMI was fairly apprised by the pleading in question that

plaintiffs were asserting that to avoid an accident like the one in question the lines should have been placed under the paved road constructed by SMI, and that SMI should have assumed responsibility therefor. We do not believe that SMI's claims of surprise and prejudice in relation to special issues 6 and 7 are valid under the record.

Other Contentions By The Parties

Our rulings on special issues 6, 7 and 18 require reversal of the trial court's judgment and rendition of judgment in plaintiffs' favor. Plaintiffs' remaining complaints are thereby rendered immaterial, and we do not reach them.

SMI has brought forward an alternative reply point and several cross points which if sustained would require affirmance of the judgment, or remand of the case for another trial in the event the judgment was reversed. Included among the cross points are contentions that the jury's answers to special issues 6 and 7 are against the great weight and preponderance of the evidence. It is our view and holding that all of SMI's points and contentions are without merit. They are overruled.

The judgment of the trial court is reversed. We remand the case to the trial court with instructions to render judgment for plaintiffs in accordance with this opinion.